[J-112-2016] [MO: Todd, J.]

# IN THE SUPREME COURT OF PENNSYLVANIA
## WESTERN DISTRICT

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 11 WAP 2016 |
| | : | |
| Appellee | : | Appeal from the Order of the Superior |
| | : | Court entered December 21, 2015 at |
| | : | No. 1829 WDA 2014, affirming the |
| v. | : | Judgment of Sentence of the Court of |
| | : | Common Pleas of Erie County entered |
| | : | October 20, 2014 at No. CP-25-CR- |
| VICTORIA LIVINGSTONE, | : | 0002750-2013. |
| | : | |
| Appellant | : | ARGUED:  November 2, 2016 |

## DISSENTING OPINION

**JUSTICE MUNDY**  **DECIDED: NOVEMBER 27, 2017**

I respectfully dissent from the Majority's judgment in this case.  Like the trial court and the Superior Court, I conclude that Trooper Frantz's initial interaction with Appellant amounted to a mere encounter.  Therefore, I would not address the community caretaking exception, and would affirm the order of the Superior Court.

As the Majority acknowledges, the Fourth Amendment generally presents two distinct inquires.  First, whether a search or seizure was effectuated, and second, if there was a search or seizure, whether it was constitutionally reasonable.  *See* Majority Op. at 12.  The instant appeal only presents us with the first question.

The standard as to whether a seizure has occurred is an objective one, looking at the totality of the circumstances.  *Commonwealth v. Lyles*, 97 A.3d 298, 302 (Pa. 2014).  This inquiry "is ultimately centered on whether the suspect has in some way been restrained by physical force or show of coercive authority."  *Id.*  (citation omitted).  The Supreme Court of the United States has observed that "[e]xamples of circumstances

[include] the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (plurality) (citations omitted). In addition, the Court has held that "when a person has no desire to leave for reasons unrelated to the police presence, the coercive effect of the encounter can be measured better by asking whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter[.]" *Brendlin v. California*, 551 U.S. 249, 255 (2007) (internal quotation marks and citations omitted).

In *Commonwealth v. Au*, 42 A.3d 1002 (Pa. 2012), an officer encountered the defendant while on patrol in the "early morning hours" when the officer saw a vehicle parked in a business's parking lot. *Id.* at 1003. The officer testified that it was unusual to see a car parked in that location at that hour, so he pulled his marked police car up next to the vehicle and used his headlights to illuminate the passenger side. *Id.* However, the officer did so without blocking the vehicle's path to leave the premises. *Id.* The officer then approached the vehicle with a flashlight and asked Au for identification. *Id.* When Au opened the glove compartment to retrieve his identification, he revealed two baggies of marijuana. *Id.* at 1004.

Relevant to this appeal, Au maintained that his interaction with the officer was an investigative detention, and the Superior Court agreed. *Id.* at 1004-05. This Court reversed, concluding that the circumstances indicated a mere encounter, and that the officer's request for Au's identification did not elevate that mere encounter to a seizure. *Id.* at 1009. We explained that the officer did not "activate the emergency lights on his vehicle; position his vehicle so as to block the car that Appellee was seated in from exiting the parking lot; brandish his weapon; make an intimidating movement or

overwhelming show of force; make a threat or a command; or speak in an authoritative tone." *Id.* at 1008 (internal citations omitted). We continued by noting, "[i]n terms of the use of the arresting officer's headlights and flashlight, this was in furtherance of the officer's safety, and we conclude it was within the ambit of acceptable, non-escalatory factors." *Id.*

The only substantive difference between this case and *Au* is that Trooper Frantz used his emergency lights instead of his headlights as a safety measure. The Majority identifies no other distinguishing factor in its mere encounter analysis. *See generally* Majority Op. 11-22. Therefore, the inquiry comes down to whether or not Trooper Frantz's use of his emergency lights transformed what would otherwise be a mere encounter into an investigative detention.

I conclude it does not. As this Court noted in *Au*, the use of headlights to peer into the passenger compartment of the vehicle was rooted in safety. *Au*, 42 A.3d at 1008. Here, Trooper Frantz activated his emergency lights as a safety precaution, not just for his own safety, but for that of other motorists on Interstate 79 as well.[1] This is consistent with the Superior Court's conclusion in this case, as well as in past cases. *See* Super. Ct. Op. at 10 (stating, "[h]ere . . . the suppression court, considering the totality of circumstances, concluded the trooper approached the vehicle to conduct a safety check[]"); *Commonwealth v. Kendall*, 976 A.2d 503, 508 (Pa. Super. 2009) (stating "it is reasonable for an officer to activate overhead lights to ensure his or her own safety as well as the safety of the driver, and to notify passing vehicles of their

---

[1] Indeed, the Motor Vehicle Code generally requires drivers passing an "emergency response area" to "pass in a lane not adjacent to that of the emergency response area, if possible[.]" 75 Pa.C.S. § 3327(a)(1). However, "if passing in a nonadjacent lane is impossible, illegal or unsafe, [the motorist must] pass the emergency response area at a careful and prudent reduced speed reasonable for safely passing the emergency response area." *Id.* § 3327(a)(2).

presence[]"); *Commonwealth v. Conte*, 931 A.2d 690, 694 (Pa. Super. 2007) (stating, "[i]n a nighttime, highway setting . . . the citizen would interpret the officer's activation of overhead lights not as a signal of detention, but rather . . . as a means to both alert other motorists of a roadside emergency and reassure the stranded citizen about the officer's identity[]"); *Commonwealth v. Johonoson*, 844 A.2d 556, 562 (Pa. Super.) (stating that the activation of emergency lights "serves several functions, including avoiding a collision on the highway, and potentially calling additional aid to the scene . . . [and] signals to the motorist that it is actually a police officer (rather than a potentially dangerous stranger) who is approaching[]"), *appeal denied*, 863 A.2d 1144 (Pa. 2004).

This is also consistent with notions of common sense and roadside safety. Law enforcement officers have a duty "to help motorists who are stranded or who may otherwise need assistance." *Commonwealth v. Fuller*, 940 A.2d 476, 479 (Pa. Super. 2007) (citation omitted). In addition, courts have consistently recognized the inherent dangers of traffic stops. *See generally Pennsylvania v. Mimms,* 434 U.S. 106, 110 (1977) (per curiam).[2] However, the Majority's *per se* rule forces an officer to choose between two equally hazardous scenarios. First, the officer keeps the emergency lights off, pulls up behind the vehicle, and approaches the driver in the dark. Second, the officer declines to intervene at all, and keeps driving down the highway. The first option would require an officer to ignore the obvious safety risks inherent in traffic stops; likely frighten or alarm the driver, who may not recognize it is law enforcement as opposed to a stranger approaching; and needlessly fail to alert passing motorists of the presence of

---

[2] Indeed, according to the Federal Bureau of Investigation's 2015 statistics, six law enforcement officers were "feloniously killed" during traffic stops or pursuits and 3,972 were assaulted. In addition, seven officers were accidentally killed during traffic stops, traffic pursuits, directing traffic or similar duties. *See* About Law Enforcement Officers Killed and Assaulted, 2015, FEDERAL BUREAU OF INVESTIGATION, https://ucr.fbi.gov/leoka/2015 (last visited May 26, 2017).

an emergency vehicle positioned on a busy interstate highway. Furthermore, it would be a dereliction of duty for an officer to keep driving past a car pulled over on the side of an interstate at night without, at a minimum, ascertaining whether those in the vehicle required help. I would not force law enforcement officials to make such a choice when striving to carry out their duties.

A police car's emergency lights serve multiple purposes. They can be used to signal a vehicle to pull over and stop, or they can signal traffic to clear a path and allow police vehicles to pass when they are responding to an emergency. In any circumstance, they no doubt serve to identify the vehicle as one being operated by law enforcement; the identification would certainly be met with relief by a stranded motorist who is being approached by a vehicle at night.

In this case, the lights were used both to signal to Appellant that assistance had arrived if needed, and for other traffic on Interstate 79 to go around the two cars. Several state courts have correctly noted that whether the activation of emergency lights escalates the encounter to a seizure depends on the totality of the circumstances in each individual case. *See, e.g., State v. Thompson*, 166 P.3d 1015, 1045 (Kan. 2007) (concluding motorist encounter was consensual and not a seizure, even though emergency lights were activated, they were used as a safety measure and "not [as] a clear show of authority[]"); *State v. Walters*, 934 P.2d 282, 287 (N.M. Ct. App. 1996) (concluding that driver was not seized where officer pulled beside parked car and activated emergency lights for safety reasons), *cert. denied*, 934 P.2d 277 (N.M. 1997); *State v. Halfmann*, 518 N.W.2d 729, 731 (N.D. 1994) (holding that no seizure occurred where motorist pulled over to the side of a highway of her own volition and officer's use of emergency lights were "a procedural precaution . . . to maintain traffic flow, and was not meant to inhibit Halfmann's liberty[]"); *Randall v. State*, 440 S.W.3d 74, 79 (Tex.

App.) (concluding that no seizure occurred where officer pulled behind parked car with emergency lights activated, noting in particular that the emergency lights were only for safety purposes, especially since car was already stopped), *rev. denied*, 382 S.W.3d 389 (Tex. Crim. App. 2012).

Here, the Majority concludes that a seizure occurred because Trooper Frantz activated his emergency lights and pulled next to an already stationary vehicle. Majority Op. at 15. Because we must look at the totality of the circumstances, it is not relevant solely that Trooper Frantz activated his emergency lights, but under what circumstances. Here, the unrebutted evidence at the suppression hearing showed that Trooper Frantz was traveling on a busy interstate highway at night and saw a car pulled over on the right side of the highway. *See* N.T., 5/28/14, at 6-7. In addition, the record showed that Appellant had no desire to keep driving at the time of the encounter because she was trying to put an address into her vehicle's GPS system, which is why her vehicle was running when Trooper Frantz pulled alongside it. *Id.* at 9. There was no testimony that Trooper Frantz displayed a weapon, physically touched Appellant's person, or used any language or tone of voice that would indicate "compliance with [his] request might be compelled." *Mendenhall*, 446 U.S. at 554. Nor does the record show the existence of any other coercive effects such that "a reasonable person would [not] feel free to decline the officers' requests or otherwise terminate the encounter." *Brendlin*, 551 U.S. at 255. In my view, an officer pulling alongside someone and asking whether that person is all right, even with emergency lights activated, is not in itself so coercive as to render the encounter a seizure within the meaning of the Fourth Amendment. To the contrary, taking all of the circumstances together, one can only conclude that Trooper Frantz effectuated a mere encounter.

In sum, although the Majority identifies the totality of the circumstances standard, it announces a *per se* rule that whenever police activate emergency lights during an encounter, it is automatically a seizure. *See* Majority Op. at 15. This is incompatible with settled Fourth Amendment principles. The totality of the circumstances reveals that Trooper Frantz's initial interaction with Appellant was nothing more than a mere encounter. Therefore, it is unnecessary in this case to consider adoption of the community caretaking doctrine since Appellant's motion to suppress was properly denied on this basis alone.[3] Accordingly, I would affirm the order of the Superior Court. I respectfully dissent.

---

[3] I agree with both the Majority and Justice Baer that law enforcement officers engage in community caretaking as an essential and important part of their duties. However, I disagree that we need to tamper with the Fourth Amendment to create a new exception in order to recognize this long-standing function of law enforcement, which is clearly articulated and established in our jurisprudence.